Your Honor, the second case of the morning, file 210-0695, Appendix Engineering, v. City of Naperville. On behalf of the Avalanche, Mr. Philip Lutkenhans. On behalf of the Avalanche, Ms. Pat Ward. Thank you. All right, Mr. Lutkenhans. How did Lutkenhans pass? Take off the T and it makes it a lot easier. Lutkenhans. Lutkenhans. That makes it a lot easier. Sorry. No, please. When you got it in like that, you don't really worry too much about how people pronounce it. Thank you. May it please the court. Counsel, Phil Lutkenhans on behalf of Patrick Engineering. Also present with me is my co-counsel, Mr. Funk. In March 2007, Patrick Engineering and the City of Naperville entered into a $436,000 consulting contract related to developing a stormwater asset management information system. While there were several different types of work performed relating to the systems, which were done by Patrick, there were two basic categories for which Patrick alleged that their amounts still owed. One is work within the contract scope for which they were not paid. And two, additional work that Patrick was required to do to complete the contract scope, change-order type work in the normal construction parlance of over $200,000. The trial court erred in dismissing these out of hand by making judgment decisions on what essentially were questions of fact at the motion to dismiss stage. So he failed to take into account the well-plugged facts and made judgment decisions based on what he thought must have occurred in this case. Were these 2-6-15, 2-6-19 motions? Both. The work performed under the contract, there's no question, and that goes to the Fourth Amendment complaint, there's no question that Patrick alleged one, a contract, two, breach for failure to pay, and three, damages. The question that the trial court raised was whether Patrick failed to allege facts stating work performed. However, the complaint specifically states the following Patrick engineering acts of performance. One, they managed and oversaw all the work on the contract. They completed the stormwater needs analysis. They collated and converted pilot area data. They implemented and configured as DECA City Works software, and they performed technical alternatives and implemented data integration. Those are all under the scope of the contract, and those are all specifically pled in the Fourth Amendment complaint. As the court held in Wake v. First Midwest, only the ultimate facts need to be alleged, not the evidentiary facts tending to prove the ultimate facts. Counsel, I have a question regarding the claims in the Third Amendment complaint for the extra work. Didn't section 2.1 of the contract require Patrick engineering to obtain written authority before proceeding with this extra work? And if that's so, I mean, is it your position that the principle of equitable estoppel bars application of this defense? Absolutely. And why is that so? Let me back up on 2.1. Why isn't the contract dispositive here? Okay, because there are many cases, and we cited several of them to you, where written sections such as 2.1, as you know, the normal construction contract, the normal contract says you can't have a change order often without written authorization. That is very similar to what's in 2.1. However, this court in Wendell said that parties to a written contract may modify its terms by oral agreement. In Wendell, again, there was a contract that said no modifications, no change orders without written authorization. And this court said that was course of conduct, oral agreements can modify that. And one of the cases that we cited to you is actually a school board case. It goes to the issue of can a municipality be estopped or order additional work without, excuse me, where you have a written agreement to the contract. Is that Stalen? Stalen. But in that case, the architect in the contract was given the actual, it seemed like explicit authority to make changes to the contract, correct?  It had to be, there were certain parameters that were not followed in that case. I would also suggest that if you look at section 3.6 of the contract, that it says specifically city shall designate a right in writing a person to act as the city's project rep. It says some other things. Such person shall have complete authority to transmit instructions, receive information and interpret and define the city's policies and decisions with respect to the work covered by this agreement. So we relied on that project representative and their statements, their directions, just like we would have an architect. Were there statements to, did they not insure him that he would be paid? Yes, they did. That's some of our allegations. But in essence, weren't they modifying the contract and were they, as city employees, authorized to modify this contract? Now we get into the estop law. First of all, in Staling you have that same issue where you have additional work because they authorized the contract. The question of corporate authorities. Judge Ellsner relied specifically and said that the only way that a city could be estopped or could order additional work was if the city council ordered that work. That's the general rule. I will give Judge Ellsner that. Judge Ellsner relied on Nielsen-Massey. The problem with Nielsen-Massey, a couple things. One is the underlying contract in Nielsen-Massey was not, was void. The corporate authorities didn't have the authority to enter into that contract because it was in violation of the statute. Second, the exception to the rule is set forth in the city services case, city service case, by the Illinois Supreme Court. And again, was followed in this court, well, it was also laid out in Great Lakes for the city of Chicago and followed again in this court in Staling and Marziani. And in that it says the exception is that to enable a party to invoke the equitable estoppel doctrine where his action was induced by the conduct of municipal officers and where in the absence of such relief he would suffer a substantial loss and the municipality would be permitted to stultify itself by retracting what his agents had done. That's the city services case. That's the Marziani case. That's the Staling case. Great Lakes case. All those cases, none of those cases did the city corporate authorities, the municipal, you know, the city council actually approve the extra work. In those cases, just like this case, the agents did. And they induced that reliance. And then when the city, excuse me, when Patrick did the work, the city said, oh, no, they didn't have that authority. That's what equitable estoppel is for. That's why this court in the past and the Supreme Court has made the exception to, quote, the general rule that it has to be the corporate authorities. Now, your opponent says you can't raise equitable estoppel if you're arguing contract. I think my opponent is incorrect. All of these cases are contract cases. Great Lakes was a contract. There was additional work beyond it. City services, I don't remember off the top of my head, so I apologize. Staling, as we talked about earlier, was a contract. It's a construction contract. Marziani is not a contract. But Great Lakes and Staling clearly are contract cases. As are the cases about amending by oral modification. Did these corporate agents in this case have authority to do what they did, or did they not? We allege they do. The problem is that we were not allowed any discovery on this issue. So we're at a 2-6-15 at that point, and we're not allowed, and even on the 2-6-19, we were not allowed discovery on that issue. So we really cannot say one way or another, but we do allege it. But it's, you know, who that person was or should have been, we were not allowed to find out. The descent of Great Lakes is kind of interesting, if I'm thinking of the right case. And that's where the—it was a City of Chicago case. It was called the Dredging of the River or something like that. And it talks about the public policy of tying a municipality to hundreds of thousands of dollars where just some stray agent is out there saying, yeah, go ahead and do that. I mean, is that what we have here? I don't think we have a stray agent. We have a number of people in the city who knew of this. It's not one person. It was just some low-level person who did it. The people who were involved were what I would assume were the project representatives. It's hard to tell, again, because we didn't have discovery. But the stipulation that we entered into for the reasons for the motion to dismiss was that the additional work was requested by the City of Naperville. Persons within the building department knew of the additional work, and no one told Patrick to stop performing the additional work. And were those the people he was told that he was going to be in contact with? Those were the people they were in contact with on a daily basis. It wasn't just some clerk down the—you know. It was Blang and Kressel and people like that? I'm sorry? Blang and Kressel? Yes. Yes. But not the city manager who signed the contract? Not the city manager. You're absolutely correct, sir. It seems like there's a public policy thing here where we're talking about, on the one hand, the municipality, as I said, being tied to hundreds of thousands of dollars because of an unauthorized act of an agent. Then, of course, you have your position, which is a company, say, reasonably relying on an agent and expending hundreds of thousands of dollars. Maybe what Judge Ellsworth got back to in resolving this was that this contract has Section 2.1, and it puts the burden on your company, your client, to actually have—put in writing the written—in writing the extras and then get a response back in writing before they actually did the extras. And there is some responses in writing on that, Your Honor. Pardon? There are some responses in writing on that issue, and we allege those. The email and the letter. Yes. Well, but doesn't the email say proceed at your own risk from Beth Lane? No, there was an earlier email that said to proceed and do it, if I'm not mistaken. You're thinking about the letter email. Well, I guess it's depending on what part of the work we're talking about, right? Correct. Yeah, whether it's the additional work or the rest of the work. But I know one of the emails—I guess I'd have to look at my notes—did have that sentence. One of the emails did have that. That was after the original email and the original notification to go ahead and do it. And that's—I mean, that's just talking about one specific part of the work. Understand that there's other parts of the work that are involved that they had to do to even get to the job that was under their scope. There were certain things such as the plans that were given by the city were incorrect. Now, they had to make those correct in order to proceed. And I know what Judge Burke is saying—Justice Burke is saying about, you know, the 2.1. 2.1 is there. No doubt about it. But so is in every one of these contracts we talk about. It says you need written authorization before a change order. Do not proceed with the change order unless you get written authorization. And all those cases said in oral conduct, oral agreements, course of conduct allow you to modify that. That section is for the owner's benefit. No doubt about it. And the cases say that benefit can be waived by the course of conduct or oral agreement. And that's what occurred here. At least, that's what we alleged occurred. And this is a question—at the very worst, it's a question of facts for us to allow discovery on and the motion to dismiss should not have been granted, and we should be able to proceed with discovery and honor complaints. To quickly go through some of the other issues, quantum merowit, we would rely on the Weider Holmes Inc. v. Kams case where a written contract existed to build a house. The plaintiff sought to recover for additional work. Not covered under the contract. Same as here. And this court found that the written contract did not preclude the pleading of a quantum merowit claim. Again, this is pleading an alternative theory. Yes, ma'am. Yet an inconsistent theory. Absolutely. Which you believe you can do. Absolutely. And that's what Weider Holmes says as well. And then the account standard issue. Here, the trial court added an additional element beyond what any published opinion has recognized. An ongoing and continuous relationship such as a utility. We have not found a case—the city has not cited any case in that regard adding that additional element. And, in fact, we've cited two cases where short-term relationships, six months or shorter, have been found to be sufficient to state a quantum merowit claim. And you believe that is an account—an account stated is a question of fact. I mean an account stated. I said quantum merowit. I apologize. An account stated is a question of fact. Absolutely. Again, another question of fact. The other thing I would just like to point out, the work performed under the contract, the $114,000 approximately—or $141,000 we allege, the city has cited no cases, not one case, to say that we had to plead something further than we did. We pled specific facts. The court—I don't know what the court was looking for. If he was looking for certain hours on certain days, but if so, that would have been a hundred-page complaint we would have had to issue. That's not what's required under the rules. Do this to him. Specific dollar amount of damages. Yeah. You're at the very beginning of the pleadings. You're at the pleading stage. Yes, ma'am. Any depositions taken at this point? No, ma'am. We were not allowed any at that point. We did issue written discovery when the issue of the affidavit came up. We were denied that discovery. Judge Ellsner said not to, but instead we got the stipulation, and that's as far as we got. The city agent or agents that you're relying on made these representations, either in writing or orally. Do they have to have authority to bind the city for equitable estoppel to apply or not? I don't think they have to have, quote, authority. I think what they—I mean, you do—we couldn't rely on a clerk. I mean, I think there's no doubt about that. I mean, we couldn't—we have to rely on someone who is giving us direction on a regular basis, who is our contact, who is their representative. And, in fact, the contract, as I said, shows a project representative as possible, that they're supposed to designate a project representative. Who that is was or if they designated it, I don't know because we haven't had discovery. But I think at a certain level, yes, that person has authority to proceed with those changes. And when the city as a whole knows of these changes and does nothing about it, the city can't benefit by sitting on its hands and saying, go ahead and do this. Certainly, these individuals in this case held them out, held themselves out as individuals who had authority, did they not? Yes, ma'am. And I think—I don't know if that's my time up or— It is. We don't have time on the call now. Thank you very much. Ms. Lord? Good morning, Your Honor. Good morning. Mr. Bailiff? Mr. Sheriff? Counsel? My name is Pam Lord. I represent the city of Naperville. I tend to speak not loudly enough, so please let me know if that's the case. First of all, I'd like to correct a couple of things that counsel for the plaintiff represented in his opening. The plaintiff did not allege that the employees had the authority to bind the city, not in any one of its five contracts. I read every paragraph, not once did they ever allege that Debbie Kressel, Beth Lang, Larry Gunderson, Bill Novak, any of the people they say they talked to, had the authority to bind the city. That allegation was never made. Nor is counsel correct in response to Justice Burke's question that it's not necessary for those employees to have authority in order to bind the city. The case law is unequivocally clear in the Second District throughout the state that employees may not bind a municipality. How about if those employees consistently hold themselves out as individuals that have authority? There is nothing in the allegations to state that they did. The only basis that plaintiff has alleged for employees allegedly holding themselves out as having authority are what is called the Debbie Kressel set of emails that dated back to April of 2007 and the Beth Lang letter of August 7, 2010. Addressing those separately, what the plaintiff does is it takes the last two sentences of three days' worth of emails and puts that into its complaint and says that's the basis upon which Debbie Kressel represented to have the authority to tell it. It could pursue the whole project. It didn't have to do just the pilot area first, as the contract clearly required. Instead, and unfortunately because it takes some time, you have to read the entire set of emails. On Friday, April 20, 2007, Scott Stocking of Patrick Engineer writes Debbie that Patrick really wants to get going, but a purchase order hasn't been executed yet for funding of the project. Debbie writes back, can you quickly give me an idea of the specific tasks you want to start on, as I'm sure I will be asked for more detail. Nothing there showing that she's got the authority to do anything. The PO is necessary because without one being established on our side, there is technically no funding to pay for the work. I have asked if I can give the okay to start, the okay to go ahead with the purchase, ahead of the purchase order, since council has approved the project funding and we are working it through our internal system. Scott Stocking writes back, basically what we want to do at this time is begin getting together some GIS and TIF plans and background documents we need to get started. We have a lot of data and source documentation that we need to obtain from the city and can use this time waiting for the official notice to proceed to start getting our resources lined up. Also, could you send me the master template for Naperville's project plan, large project. I plan to get a draft of that done. To which Debbie Cressel responds, please take this email dated April 23rd, 2007, as a limited notice to proceed with work related to field data collection and conversion of Area B. I have spoken with Mike Bevis, purchasing manager, and he has authorized the limited notice to proceed as we await an internal contract and PO approval. Then, unfortunately, justices, in order to understand Debbie Cressel's email of April 23rd, you have to look at the scope of the contract. And the scope of the contract where it says field data collection also says that the pilot area of the project has to be done first. The very section of the contract that she points to includes about 20 paragraphs later, but it's all part of the same scope. Isn't that simply her interpretation of the contract? No, that's exactly what the contract says. I thought the contract said the pilot data was required to be completed and accepted by the city prior to the vendor proceeding with the remainder of the data collection in Area B. Is there any other area in the contract that talks about that being prerequisite to anything other than the remainder of the data collection in Area B? In terms of the statutory configuration? In terms of any other aspect of this contract that they were supposed to do for the city. Okay? That sentence I just read to you, plain language of that at least appears to be that the pilot data has to be accepted by the city before the vendor proceeds with the remainder of the data collection in Area B. Nothing more. Just the remainder of the data collection. Not Azteca, not any other type of work on the contract. Your Honor, the data collection and conversion of Area B was pretty much the whole project. The other aspects, the other components, Azteca and all that, were necessary components. And to answer your question, no, they could do the Azteca, and part of the project management for the pilot area would also be paid as part of the pilot area collection. So I'm not sure if I answered your question. I mean, are there parts of this contract that could have been done outside of the data collection in Area B? Yes. Okay. That was my question. Did they not, did the city not ask Patrick to collect additional areas or additional categories on that, under that contract? Weren't they asking him to expand the contract? No, Your Honor. Didn't it go from a pilot area of one square mile to three square miles? Yes, Your Honor, and I'd like to address that. Thank you for the opportunity. Patrick alleges that because the city expanded the pilot area from one to three square miles, that that was an additional service for which it should be entitled to unknown extra money. Actually, logically, that doesn't make any sense because the pilot area is part of Project of Area B. It's all the same area. It's just the beginning part of it. But wouldn't there be more work to get data from three square miles than one? But the job, Justice, was to get data for 20 square miles, of which the one to three square miles was part of it. It was encompassed within that 20 square miles. Did they pay him for it? Yes. For the three square miles? We paid Patrick Engineering for every single bit of work that it did that was approved. And further, the last point I'd like to make is that it's disingenuous on Patrick's part. Yes, the signed contract with a scope that's like 20 pages long does say one square mile, but the letter dated August 7, 2010 from Beth Lang that's attached as Exhibit 5 to Patrick's third amended complaint specifically says, as agreed upon at the pre-bid meeting, we changed the pilot area from one square mile to three square miles so that it would be a better representation of what the pilot should be. So that was done prior to Patrick even beginning work in April of 2007. So did you pay for the three square miles to be done or the one? We didn't pay for the pilot area, all of the pilot area, because they didn't finish the pilot area, Justice. They never finished the beginning of the project. Here's the pilot area. Here's the rest of Area B. The pilot area is in there. They didn't finish the pilot area, and they're claiming payment for the entire contract. $436,382, just $10 short of the entire value of the contract, is being sought by Patrick even though they didn't even get done with the one to three square miles that they were asked to do. And actually, I don't believe the record shows it, but I don't think they got more than one square mile done. But that's not the issue. The issue is did the city pay Patrick for what it was for the work it performed? It did. It paid every cent that was approved and probably more. Well, of course, the argument is that the city improperly refused to accept the data, and we have to take that as true right now because we're in a pleading state right now. We're not after trial. If we were after trial, it would be totally different. So we have to take it as true that, as far as the pleading goes, that the city improperly disapproved that pilot area. So what happens, Justice, is that within three months of starting work on the contract, Patrick decides that a change order is needed as they're working on the pilot and getting together the documents. And they demanded that a change order be issued, and one wasn't. So they stopped work, which is what resulted in the Beth Lang letter of August 10, 2007. If Patrick had taken the position back in August of 2007 that the city, or even earlier in late 2007, that the city was unreasonably withholding acceptance of its approval of its pilot area data, that would have been the time to speak up, not to just continue to internally invoice hundreds of thousands of dollars of services independently and unilaterally claimed it was performing because the city was unreasonably denying approval of the work they performed. Are you denying that anybody gave them an indication to go ahead and do more work? Are you denying that was ever done? And, or are you saying, yes, it was done, but they weren't authorized and it didn't come in writing? I guess what I'm getting to is the equitable or full-stop argument. Do you feel we ever get there? Let me turn to that, Your Honor, just one second. First of all, and one of the comments I wanted to make at the outset was that this is supposed to be a contract dispute, a contract case, but in reality when you look at the case and the pleadings, six out of seven are all about equity. Patrick alleges in counts one and two of his third amended complaint that those are titled breach of contract cases, claims, but 90% of the pleadings are that they relied upon the representations of Debbie Kressel, Bill Novak, Beth Lang, Larry Gunderson. Can't you plead alternative theories at the pleading stage? You can't. And in terms of the, that's the unjust enrichment. They pled unjust enrichment as the alternative to their counts one and two. Are you saying you can't plead equitable and stockle and plead contract at the same time? In the same count. And as noted in footnote five of Patrick's brief to the appellate court, page 24 of their brief, the reason Patrick's third amended complaint contained two breach of contract claims was due to the trial court's ruling on the first amended complaint. In ruling on the motion to dismiss the first amended complaint, the trial court held that Patrick's claims for both the work expressly called for under the agreement and the extra work could not be alleged in a single count. So the trial court early on said don't mix these up. Keep them separate. We, both the trial court and the city, looked at their new counts one and two and said, okay, equitable and stockle. They're titled breach of contract, but they're equitable and stockle. And no, I don't believe that they have fled the causes of action for equitable and stockle. They point to cases, Marjani and Stalen City Services as foundation for the basis that even though you have a written contract, if you get oral representations, that can override a written contract. Those cases are not applicable. Two out of three are zoning cases. The Wendell case is a private case that doesn't deal with a public entity, which is a totally different set of standards. How do you distinguish city's oil service? City's oil service was a zoning case where two permits were issued. Correct. I know the Faxon case, but how? By the city. So somebody with authority issued, who had authority to issue the permits, issued permits upon which they relied to their detriment. They built gas station pumps. They built all kinds of things. He's saying that the people here had authority. They didn't allege that. Not once. And you can't just say it. He doesn't allege. Furthermore, the other very important point I wanted to correct was that Mr. Lucan said that in the stipulation, the city agreed that the city knew that they were performing additional work and were not told to stop, and that Patrick was not told to stop performance of that work. That is not correct. The stipulation, which is on C1475 of the record, clearly states that a building officer or employees in a building department, someone in the building department knew Patrick was performing additional work, not the city. Equitable estoppel cannot apply when employees allegedly authorize additional services. Moreover, in order to buy this argument, you would have to believe that these people had authority to write a blank check because at no time does Patrick ever allege that they were given authority to do $50,000 more work or $60,000 more work. They simply allege they were authorized to do more work, and they allege hundreds of thousands of dollars of more work without a shred of a basis for why hundreds of thousands of dollars was okay. That's the very reason why the case law says you cannot rely on ministerial officers, even if you were to accept that the oral representations that they pledged that these people had authority. You can't do that. Otherwise, taxing bodies would be on the hook for all kinds of money they never agreed to. On the flip side, you have people who are holding themselves out as individuals who have authority and asking a contractor to do additional work. And then he does it, and then they say, well, we can't pay you because they shouldn't have been holding themselves out. So is that equitable? Your Honor, I'm not sure I know the basis on which you're saying that they're saying that anybody held themselves out as having authority. 3.6 of the contract read by Mr. Lucan specifically says that the project representative can only transmit instructions, transmit and accept and receive information. And they tell him to go forward with things, and he goes forward, and then they say, well, we're not going to pay you because they weren't authorized. So on the flip side of what you said, counsel, you know, it's unfair for a city to have to pay money. Isn't it unfair for a contractor to perform work and then not get paid? Yes, Your Honor, it would be. And in fact, the case cited by Mr. Lucan, I think it's Whiter Combs, was an unjust enrichment case where a mechanic's lien was technically flawed, and the court said, you know, this isn't right because work was performed and you didn't get paid for it, so we're going to give you this right. But in that case, there wasn't they found that the contract was technically flawed, and therefore, without unjust enrichment, the contractor had no basis to collect for services performed. That wasn't the case here. We had a contract. We paid $77,312.20 on that contract. Furthermore, I know I've only got a few minutes, if I may. Unjust enrichment doesn't apply, if I can go to that account for just a second, because the services that are claimed in the unjust enrichment claim are the same services covered by the contract, the identical services, the stormwater needs management assessment and data collection and conversion of stormwater data. And they claimed that they performed them during the same time, that the contract was in effect. What really happened three months into the contract was that Patrick figured out that they had underbid, underestimated, and they demanded a change order, and when that was not forthcoming, they said, we're stopping work. This has got to be forthcoming because it's going to cost a whole lot more money. And when it didn't come, and Beth Lane's letter surely is not authority for them to go off and spend hundreds of thousands of dollars. It says proceed at your own risk. Finish the pilot area first. Without formal acceptance of the pilot area, you can't go forward. Yet they claim unjust enrichment so that they can try to find a means of getting those extra monies paid, the ones that they didn't estimate properly for when they bid the contract. And finally, with respect to the breach of contract count, I don't know how much more time your honors want to give me on this. Yes. All right. I think at this time your time is up. Thank you. Okay. Thank you very much. Thank you. Mr. Williams, could you start with answering the question or the issue raised by counsel that nowhere in your pleadings did you allege authority of these city agents? We may not have. The reality is, though, the stipulation covers that. The stipulation says the additional work was requested by the city of Naperville. That was the stipulation we entered into so we wouldn't have to go find who had the authority on the discovery. That's why we entered into the stipulation. So it's by the city of Naperville. Exactly who that was or what that person was would be something when we find the discovery. But the stipulation says the additional work was requested by the city of Naperville. And in my colleague's comment that I said that the persons within the city knew the additional work, I think my quote was persons within the building department knew the additional work because that's directly out of the stipulation as well. What's really happening here is, well, let me just, you heard Ms. Lord say a few times what really happened, what really happened. Well, we're not at that stage. She can argue that six months from now after we've gone through discovery. She's adding additional facts to what's in the pleadings. And that's kind of, that's exactly what the court did. That's what Ms. Lord's doing and what the court did and the error the court made. What's your response to her argument that the counts under equitable, or was it equitable estoppel or quantum error what I think she said? I think it was equitable estoppel. Equitable estoppel or the same duties or responsibilities as were under the contract. You know what, I apologize. I think I led you wrong. I think at that point she was talking about quantum error. I think you're correct. I was misunderstanding your question. It's funny because what you're hearing, first of all, we're not saying they're the same duties. You're not saying that. So that is you submitting the question for the prior fact. Correct. This is additional work outside of the contract. And they're saying it's additional work outside of the contract they didn't approve. So for them to say, well, it's all contract work, but no, on one hand, when they talk about quantum error, but on the other hand, saying it's additional work outside of the contract we didn't approve, that makes no sense. It doesn't follow. The work within the contract is the Fourth Amendment complaint. The first argument I made. That's the specific work within the contract that we said we had to do that we weren't paid for. Going back to, I think, Judge Burke's original question, which is there any work that, and that's the stuff we alleged in the Fourth Amendment complaint. So that's the contract work. The additional work, the things we had to do outside of the contract, is really the quantum error or the equitable establishment. Which are different than the work within the contract. Yes, ma'am. Let me go back to my notes. Again, Ms. Lord said that we need the authority of the agent, that under the second district cases you need to show the authority of the agent. However, she cited not one case to that effect. All her position has been in the briefs and all her position, Judge Ellsworth's position was that unless it's the city council, forget it, it doesn't matter. That was what Judge Ellsworth ruled. I think the cases kind of look to the facts to see whether the person had. I mean, Stalin is a clear example of where the court looked at the contract and found that this person actually had authority under the contract. I mean, Kenny, the Supreme Court looked at the contract and found specifically that it wasn't the plaintiff that was required to bring the change orders to the attention of the city before they were approved. It was the chief engineer who was supposed to do that. And the chief engineer was the one who was making all these change order requests. So, I mean, I think we're looking. The cases tend to look to the issue of authority, whether it's in the contract or whether the plaintiff doesn't have to ask for the. The plaintiff's not the one on the hook to ask for the changes. Whereas here, I mean, we have, again, we get back to 2.1, that contract says that your client's supposed to be asking for the changes. Your Honor, let me go to where you're really talking about. And that is, under those cases, there was a factual scenario. You got a chance to list, to go through the facts, to do discovery, to have a hearing. That's what determined it. We never got that chance. That's the problem here. At the end of the day, Ms. Lord, and I don't agree, but Ms. Lord, the court may agree with Ms. Lord. But that's at the end of the day. That's not today. We haven't had that chance. And that's my problem. I mean, you have to present something in your complaint other than, you know, unjust enrichment and equitable stop, and let's have the state go to trial. I mean, you have to address some facts. And we did. In this case, we alleged the city who directed us to do it. That's the stipulation. That stipulation came up, understand, they came up with an affidavit. We asked to depose that person. We asked for certain discovery around that issue. Instead, we came up with this. The judge said, well, you stipulate to the file. And one of the things we stipulated to was the additional work was requested by the city of Naperville. It wasn't it was requested by a low-level person. It was requested by the city of Naperville. And that you were induced to? Correct. To act upon it. Yes, ma'am. And I think my time is up. And that would put us into the staling category of somebody with authority asked you to do the additional work. Yes, sir. That's the stipulation. Okay. Anything else? No, ma'am. Thank you. Thank you very much, counsel. Any last questions? Huh? Well, at this point, I apologize. It's not within our rules at this time. So, if you have other, if you have anything that would supplement the record, you can make a written motion to do that. But in terms of rules for oral argument. We'll do that. Thank you. The court stands in recess until the next hearing.